# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| A.A., a minor, by LAURISA ANTLE, her | ) | |
| custodial parent and next friend, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:11-CV-60-PRC |
| | ) | |
| PORTAGE TOWNSHIP SCHOOLS, | ) | |
| Defendant. | ) | |

## AMENDED OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment [DE 29], filed by Defendant Portage Township Schools on January 31, 2013, and on Defendant's Motion to Strike Portions of Plaintiff's Statement of Genuine Disputes [DE 44], filed by Defendant on May 3, 2013. For the reasons set forth in this Opinion and Order, the Court grants in part and denies in part the Motion to Strike, grants the Motion for Summary Judgment as to the Title IX and § 1983 claims, and remands the state law claims.

## PROCEDURAL BACKGROUND

On January 20, 2011, Plaintiff A.A. filed a Complaint against Defendant Portage Township Schools in the Porter County, Indiana Superior Court. Plaintiff brings federal claims under Title IX of the Education Amendment of 1927, 20 U.S.C. § 1681 (Count IV), and the Fourteenth Amendment Equal Protection Clause, 42 U.S.C. § 1983 (Count V), alleging that Defendant failed to prevent, stop, or remedy known, ongoing, severe, pervasive, and objectively offensive sexual harassment amounting to gender discrimination against Plaintiff. Plaintiff also alleges state law claims of negligence, negligent infliction of emotional distress, and negligent hiring, supervision, and retention (Counts I, II, III).

Defendant removed the case to this Court on February 16, 2011. On February 22, 2011, Defendant objected pursuant to Federal Rule of Civil Procedure 17 that Plaintiff, a minor, did not have the capacity to sue or be sued. On March 10, 2011, an Amended Complaint was filed with

Plaintiff identified as A.A., a minor, by Laurisa Antle, her custodial parent and next friend; there were no substantive changes to the Amended Complaint. Defendant filed an Answer to the Amended Complaint on March 11, 2011.

On January 31, 2013, Defendant filed the instant Motion for Summary Judgment and memorandum in support. Plaintiff filed a response brief on April 10, 2013. On May 3, 2013, Defendant filed a reply in support of the Motion for Summary Judgment as well as the instant Motion to Strike Portions of Plaintiff's Statement of Genuine Disputes. Plaintiff filed a response to the Motion to Strike on May 13, 2013. Defendant has not filed a reply in support of the Motion to Strike, and the time to do so has passed.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate – in fact, is mandated – where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show

that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MOTION TO STRIKE

Defendant Portage Township Schools asks the Court to strike various assertions contained in Plaintiff's Statement of Genuine Disputes because they are unsupported by the evidence or constitute argument. "The purpose of Rule 56-1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments." *1st Source Bank v. Vill. of Stevensville*, No. 3:11-CV-205, 2013 WL 2285367, at *3 (N.D. Ind. May 23, 2013) (citing *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006)). As this Court has routinely held, "[i]n reviewing a party's statement of material facts, a court must 'eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement.'" *Id*. (quoting *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012); *see also Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 596 (N.D. Ind. 2006) (citing cases).

Defendant is correct that many of the headings are argumentative. However, the headings serve only to organize Plaintiff's Statement of Genuine Disputes, and the Court does not consider

them to be offered by Plaintiff as statements of fact supported by evidence. Thus, the Court will not strike the headings.

As to summaries, introductions, transition phrases, or conclusion paragraphs throughout Plaintiff's Statement of Genuine Disputes that are not supported by citation to evidence, the Court does not consider them to be properly supported facts and, thus, does not include them as material facts for consideration on summary judgment. This is true of the Court's review of any party's statement of material facts or statement of genuine disputes offered in support of or in opposition to a summary judgment motion. Furthermore, the Court does not consider Plaintiff's characterizations of or commentaries on evidence to constitute admissible material facts. Rather, the Court only considers the material facts to the extent they are supported by the evidence of record.

Defendant also argues that many of Plaintiff's asserted material facts are either supported by inadmissible evidence or unsupported by evidence in the record. The Court considers each of these specific objections in turn.

First, Defendant argues that Plaintiff attributes statements of individual employees of Defendant Portage Township Schools to Defendant Portage Township Schools generally. In these instances in the Material Facts, the Court has identified the individual employee as giving the testimony and has removed any characterization of the testimony. For example, Plaintiff writes: "Not only did Defendant expect that its students would be transported safely, it also expected that its students would be actively protected from assault while at school and even while on a school bus." (Pl. Stmt. Genuine Disputes, p. 5 (citing Dep. of Oprisko, p. 28, ll. 12-16.)). The cited lines of Ms. Oprisko's deposition provide:

Q:  As a school board representative, you would expect the school to protect
    their kids from assault?
A:  Yes.
Q:  This is even on a school bus?
A:  Yes.

(Pl. Stmt. Genuine Disputes, Exh. 4, p. 28, ll. 12-16 (Oprisko dep.)). The Court has included in the Material Facts this statement based on the cited evidence: "School board member Oprisko testified that, as a school board member, she would expect the school to protect the kids from assault, even on a school bus."

As another example, Defendant cites Plaintiff's statement: "Since Mr. Burch was an employee of Defendant, Defendant admits it is responsible for Mr. Burch's conduct." (Pl. Stmt. Genuine Disputes, p. 2 (citing Dep. of Oprisko, p. 29, ll. 5-13; Answer ¶ 10.)). In paragraph 10 of the Answer, Defendant admitted that "[t]he drivers of these school buses are employees of Portage Township Schools;" in her deposition, Ms. Oprisko testified that a school bus driver is an employee of the school and that generally the school is responsible for the conduct of a school bus driver because he or she is an employee of the school corporation. Notably, neither citation references Mr. Burch. Thus, based on the cited evidence, the Court includes the following in its Material Facts: "Defendant is generally responsible for the conduct of its school bus drivers because they are employees of the school corporation." To the extent that the parties dispute whether the knowledge of a school board member can be imputed to the school corporation, that is a legal and not a factual issue.

Next, Defendant notes that Plaintiff makes two references to an incident in which one of the male students pulled his pants down and stuck his bottom out of the bus window. Defendant argues that Plaintiff fails to acknowledge that the student had shorts on under his pants, which he did not pull down, and that Mr. Burch reported the incident. The Court has included these additional facts in the Material Facts.

Defendant argues that, in the second full paragraph on page 5 of the Statement of Genuine Disputes, Plaintiff states that "Mr. Burch could see 'all the way back in the bus by looking at the inside mirror.'" (Mot. Strike, p. 8 (citing Pl. Stmt. Genuine Disputes, pp. 5)). This is incorrect. That paragraph discusses the training provided to drivers, including Mr. Burch, regarding the use

of mirrors and the explanation by Ms. Whitten that "you can see all the way back in the bus by looking at the inside mirror." (Pl. Stmt. Genuine Disputes, Exh. 10, pp. 21-22). There is no statement in the paragraph drafted by Plaintiff regarding what Mr. Burch could actually see. The Court considers this fact based on the deposition testimony only. The Court also includes the additional fact offered by Defendant that Mr. Burch testified that he could not see "horse-playing" because he could only see the seated students from the shoulders up because the back of the seats come to shoulder height. (Mot. Strike, Exh. 1, p. 420 (Burch dep.)).

Next, Defendant contests Plaintiff's characterization of David Harman's testimony regarding bus driver training as to discipline as lasting only one hour and that Defendant never provided any "general training on discipline" to Mr. Harman or to Ms. Coker, the assistant supervisor of transportation. In the Statement of Genuine Disputes, Plaintiff cited only page sixteen of Mr. Harman's deposition; Defendant cites to additional testimony from Mr. Harman's deposition expanding on this testimony. The Court includes the additional supported facts in the Material Facts.

Defendant contests Plaintiff's characterization of principal Caren Swickard's testimony that "bus discipline was the discretionary responsibility of only her and her administrative team," (Pl. Stmt. Genuine Disputes, p. 8 (citing Dep. of Swickard, p. 3, ll. 8-9; p. 23, ll 4-7; p. 32, ll. 1-9)), which is not supported by the deposition testimony. The Court includes the material facts based on the evidence of record.

Defendant argues that Plaintiff mischaracterizes the testimony of Ms. Coker that Mr. Burch was advised not to report all discipline issues. *See* (Pl. Stmt. Genuine Disputes, p. 10 (citing Dep. of Coker, p. 22, ll. 20-25; p. 23, ll. 1-13)). The Court agrees and has drawn this fact directly from the language of Ms. Coker's deposition.

Defendant takes issue with Plaintiff's statement that bus driver reports of discipline problems were usually ignored because the evidence in support of the statement is the testimony of one bus

driver regarding the feeling that she and other bus drivers had that their reports were ignored. *See* (Pl. Stmt. Genuine Disputes, p. 10). The Court considers this fact as set forth in Ms. Salinas' actual testimony. Similarly, the citation to Ms. Coker's deposition testimony for the same statement is also misplaced, and the Court has included the facts as stated in Ms. Coker's testimony, which also addressed the bus drivers' feelings, including the fact that the bus drivers felt discouraged because the results of their reports were not getting back to them quickly enough.

Defendant argues that Plaintiff mischaracterizes Ms. Salinas' testimony that drivers were told to "keep quiet" about the incident or that they would be fired. *See* (Pl. Stmt. Genuine Disputes, p. 10). The Court agrees that her testimony was that the bus drivers were told to stop "gossiping" about the incident or they would be fired.

Finally, Defendant identifies additional testimony of Ms. Salinas regarding the incident when she was threatened as a bus driver by certain boys. The Court has included that information in the Material Facts.

Based on the foregoing, the Court grants in part and denies in part the Motion to Strike. The Court has applied the above-stated principles consistently throughout its consideration of the material facts and genuine disputes identified by both Defendant and Plaintiff.

## MATERIAL FACTS

### A. General Background

During the 2008-2009 school year, Plaintiff A.A. was a student at Portage High School. Portage High School had approximately 2,700 students enrolled of which approximately 2,000 were transported to and from school by bus on 100 different bus routes. Plaintiff was primarily transported to school by bus number 82, driven by Terry Burch. Mr. Burch was an employee of Defendant and had been employed as a bus driver with Defendant for approximately a year and a half.

During the 2008-2009 school year, Plaintiff was subjected to harassment on the bus, including being terrorized, bullied, and sexually harassed, by three male students: A.T., C.M., and J.C. These three students engaged in various types of inappropriate behavior on bus number 82, including blocking the bus aisle, fighting, lighting paper on fire and tossing it out the window, one of them standing on the seat and pulling down his pants to display undershorts out the window, and using profanity.

Some of the harassment was directed at Plaintiff personally. C.M. threatened to kill Plaintiff. A.T. make various sexual comments to Plaintiff such as telling her that she had nice "titties," grabbing and squeezing her breasts on numerous occasions while on the bus when he sat with her. She also testified that "[t]hey'd . . . grab my genital area." (Def. Br., Exh. 3, p. 168, l. 4). Plaintiff did not tell Mr. Burch, school administrators, teachers, or her parents about this touching; she only told her best friend. Plaintiff testified that she witnessed the boys touching other female students in the same way they had been touching her.

Plaintiff testified that, when A.T. blocked another student in the aisle, Mr. Burch "would say, come on, she's got to get off and stuff." (Def. Br., Exh. 2, p. 39, ll. 9-10; p. 52, ll. 14-25 - p. 53, ll. 1-5 (A.T. Trial Transcript)). Plaintiff testified that, when the three boys were lighting paper on fire by spraying it with a body spray and then throwing it out the window, she was not worried. She testified that they were being secretive about lighting the paper and that none of the students told Mr. Burch. She also testified that the bus driver told them to stop when he pulled the bus over and started yelling at them and that they stopped. When C.M. threatened to kill Plaintiff, she told Mr. Burch, who gave her a form to fill out; Plaintiff filled out the form and gave it back to Mr. Burch, and a week or so later C.M. complained to Plaintiff that she had gotten him a two-hour detention. C.M. did not bother Plaintiff after that. Mr. Burch reported the incident of the student pulling down his pants.

On February 5, 2009, C.M. sat down on the seat next to another female student against her wishes halfway through the bus ride and began making sexual gestures by sticking his finger into his exposed belly button. C.M. then began pulling up his shirt, telling her that he was going to belly dance, and started to rub her leg. The girl asked him to get out of her seat. The victim turned her head to ignore C.M. who then pulled his pants all the way down, exposing his genitals. J.C. pushed the female student's head down toward C.M.'s exposed genitals. The female student was able to resist J.C. before touching C.M.'s lap and thereafter immediately called her stepfather, who agreed to meet her at the bus stop. Plaintiff testified that she saw the female student's head going down.

Later that afternoon, a Portage police officer arrived at the school and advised that there was an accusation made that there had been a sexual assault on the bus. Troy Williams, the school resource officer and a member of the Portage Police Department, received a phone call from the responding officer, who told him that there had been an incident on the bus. Officer Williams asked that the report be faxed to school when complete so that he could review it first thing in the morning. He then contacted the principal and the associate principal; they all agreed to meet the students in the morning as they were getting off the bus. The next day, Officer Williams and the school administrators met the three students and escorted them into the school office to be interviewed separately. Defendant immediately suspended the three students as a result of the previous day's incident and began an investigation. By February 27, 2009, all three students were expelled until second semester of the 2009-2010 school year.

The "Description" for the incident in each of the boys' discipline records provides:

"These incidents unfortunately were unreported due to threat of retaliation by [C.M.]. His threatening of students, the bus driver and even the step-father of the girl involved was an ongoing occurrence."

(Def. Br., Exh. 4).

"These incidents unfortunately were unreported due to the threat of retaliation by [A.T.]. His threatening of students, the bus driver and even the step-father of the girl involved was an ongoing occurrence."

(Def. Br., Exh. 5, p. 6).

"These incidents unfortunately were unreported due to the threat of retaliation by [J.C.].

(Def. Br., Exh. 6, p. 4).

As a result of the February 5, 2009 incident, Mr. Burch was immediately suspended with pay on February 6, 2009. After Defendant's investigation, Mr. Burch was terminated as of February 23, 2009. Mr. Burch testified at his criminal trial that he did not observe the three boys "bothering" other students and would not have allowed sexual harassment to occur on the bus. He testified that he did not see any of the alleged conduct that occurred on February 5, 2009. He also testified that he did not see any inappropriate comments or touching of Plaintiff by A.T. Mr. Burch testified that he could not see horse-playing because he could only see the seated students from the shoulders up because the back of the seats come to shoulder height.

A.T., C.M., and J.C. had each been disciplined prior to the 2008-2009 school year due to various violations of the school rules. Specifically, during the 2007-2008 school year, A.T. was disciplined for various reasons for his conduct at the school building, including incidents related to making inappropriate sexual gestures, using profanity, inappropriately touching two female students in a sexual manner, and showing shirtless pictures of himself to a female student. A.T. was disciplined for these reported incidents, and, after progressive discipline, he was ultimately expelled in May 2008 for the remainder of the school year. A.T. returned to Portage High School for the 2008-2009 school year. Upon his return, he was disciplined for tardiness, and he had one incident of discipline due to distracting behavior, for which he was removed from class. C.M. was suspended on September 10, 2008, and again on December 16, 2008, for engaging in a physical altercation with another student. J.C. was suspended on November 18, 2008, for making verbal threats to a student.

Other than the incident in which C.M. threatened to kill her, Plaintiff did not report any of the other harassment or bullying. She testified that she did not tell anyone abut being touched

because at first she did not think she should have; when asked why, she testified that she did not know why she thought that. The only person that she confided in was her best friend.

Plaintiff's grades steadily remained Cs and Ds throughout her school career, including after the alleged harassment and the February 5, 2009 incident. Plaintiff missed a lot of school after the February 5, 2009 incident due to illness; she testified that she did not miss school because of what happened on the bus. She graduated in 2011 from Portage High School. At her December 13, 2011 deposition, Plaintiff had hopes of attending Ivy Technical School to become a phlebotomist and had applied, but had not yet enrolled in classes. At the time of the deposition, Plaintiff was not employed.

Plaintiff sought no medical treatment, counseling, or mental or other health care as a result of the incidents on bus 82. However, she testified that, after the sexual harassment and bullying, she became a very different person, did not want to be with her friends, wanted to just sit home all the time, and had very little interest in leaving home or participating in social gatherings. At the time of her deposition on December 13, 2011, Plaintiff had only one friend.

At her December 13, 2011 deposition, Plaintiff was asked whether anyone has suggested to her that she seek some type of counseling or treatment as a result of her mood swings or her episodes of anger. Plaintiff responded that her sister had.[1] Plaintiff explained that her sister had recommended counseling or treatment after Plaintiff's boyfriend died and not as a result of the incidents on the bus. She testified that her mood swings or anger have increased since her boyfriend died. Regarding her mood swings and anger, she explained, "it's much worse than what they've been. I mean, raising a kid by yourself is hard." (Pl. Br., Exh. 6, p. 18, ll. 20-21). Plaintiff saw a psychiatrist for a few months from June to August 2011 after her boyfriend died.

---

[1] On page 4 of her Statement of Genuine Disputes, the first two sentences of the third full paragraph are not supported by the cited evidence. Therefore, those facts are not included. Also, because only certain pages of the deposition were submitted, there is little context for the evidence cited in support of the third sentence in that paragraph. As a result, the Court has included Plaintiff's deposition testimony as it is reported in the deposition transcript without the characterization given by Plaintiff in the Statement of Genuine Disputes.

## B. Driver Training

Defendant has a standard procedure for hiring bus drivers that begins with an employment application. If an applicant is selected, a driving record check is conducted, and then a background check is conducted. The individual is then trained for a commercial driver's license. The applicant is given Defendant's policies and procedures to review (which include student discipline issues), as well as education regarding transportation and mechanical issues. The applicant is placed on a ride along to observe current drivers and completes classroom training sessions, eventually driving a bus while under the observation of a current bus driver. If hired, drivers are trained by supervisor of transportation David Harman or the assistant supervisor on an ongoing basis as situations arise. Also, there is occasional training throughout the school year to review different aspects of the manual.

Defendant is generally responsible for the conduct of its school bus drivers because they are employees of the school corporation.

Defendant trained its bus drivers, including Mr. Burch, to scan the mirrors in the following order: side mirror, crossover mirror, crossover mirror, side mirror, and inside mirror, to make a complete circle so that the driver could continually monitor what was happening on the bus. This is because a driver can see all the way back in the bus by looking at the inside mirror.

Barbara Whitten, who was the head trainer for bus drivers and who trained Mr. Burch, indicated that there was no specific training on sexual harassment or bullying. When asked at her deposition whether "you ever discuss, in your training sessions, what to do in sexual harassment cases or bullying cases? Or does that not come up?", she responded, "No, not - - no. If they were to ask me, I would bring it up. I tell them, you cannot predict the unpredictability [sic]. Everything that's going to happen is going to happen. Something happens you don't know what to do, come see me." (Pl. Br., Exh. 12, p. 26, ll. 6-13). Assistant supervisor of transportation for Defendant, Catherine Coker, testified that, in 2008-2009, there was no specific training for bullying or sexual

harassment for bus drivers and she was not even sure what Defendant's policy was towards sexual harassment.

Mr. Harman testified that bus drivers received approximately one hour of one day of classroom training on general bus discipline during the 11-day training period that was conducted by the driver trainer; as part of the 11-day training, the trainees would ride with seasoned drivers, and discipline is one of the areas the seasoned drivers were asked to cover with the sub drivers. Mr. Harman confirmed that there are no specific training manuals or other materials about sexual harassment. When asked whether in 2008 and 2009 the school administration or any of the school employees had provided any specific training for him and his assistant regarding discipline on the bus, he answered that he did not believe so. However, he had received training at the state level on how to handle sexual harassment. He further testified, "The training we have had from Portage schools on that is the referral of all sexual harassment claims to one of the assistant superintendents." (Def. Mot. Strike, Exh. 4, p. 17, ll. 16-18).

Mr. Burch testified that he never received any formal training on how to handle discipline problems.

### C.  Discipline Policies and Bus Rules

Pursuant to the 2008-2009 Student Handbook, Defendant's policy was that "the Portage Township School bus drivers have the responsibility of safely transporting students to and from school." (Pl. Br., Exh. 4, p. 25, ll. 12-14; Pl. Br., Exh. 11, p. 31). The policy continues, "Bus drivers' rules and regulations will be adhered to at all times. Videotapes may be made of the passengers on any bus trip at any time. Any misconduct will be reported to school administration, which could result in disciplinary action including loss of bus privileges." (Pl. Br., Exh. 11, p. 31). Ms. Oprisko testified that, as a school board member, she would expect the school to protect the kids from assault, even on a school bus. Ms. Oprisko expected that the bus drivers, just like the teachers, would protect their students from bullying and other crimes and expected bus drivers to use their

five senses to be aware of what is happening on their buses. As the bus driver, Mr. Burch was acting as a representative of the school on the bus.

Defendant maintains a "Harassment Policy" found in Section 2.18 of the Portage High School Student/Parent Handbook:

> sexual, racial, ethnic, or other forms of harassment by students toward other students . . . will not be tolerated and/or endorsed by the Portage Township Schools. Student[s] will not exhibit or demonstrate unwelcome, offensive behavior (language, physical contact, bullying or degrading activity) toward one another . . . . Harassment may include but not necessarily be limited to:
>
> a.  Subjecting a student or employee to a hostile or abusive environment such as explicit sexual or racial language, degrading or demeaning joking, or offensive pictures.
> b.  Interfering with a student or employee's performance by creating an intimidating, threatening or hostile environment.
> c.  Knowingly permitted[sic] students or employees to demonstrate habitual offensive behavior without taking some form of corrective action.
>
> Students may file complaints with an administrator. All complaints must be written and will be promptly and thoroughly investigated. A student who violates this policy is subject to disciplinary action which could lead to suspension and/or expulsion from school.

(Def. Br., Exh. 14, p. 41-42).

Defendant also had a written policy against bullying, titled "Threats/Intimidation":

> Bullying, such as threatening or intimidating any other individual is a major offense. This includes a physical, verbal, or written act or gesture that is intended to inflict injury, violence, or a reasonable fear of injury or violence upon another individual, as well as threats of bringing or using a weapon or explosive device on any Portage Township School property. Disciplinary actions will be taken and the School Resource Officer may be contacted.

*Id*. (p. 43 (§ 2.26)). The School Board discussed that a student who is the subject of bullying might be reluctant to disclose the bullying to his or her parents or school administrators because of the fear of reprisal.

In 2008-2009, pursuant to the handbook, the only grounds for an automatic suspension was bringing a firearm or drugs to school. A male student who grabbed a girl's breast in a sexual manner

would not have been subject to an automatic expulsion. Johnny Winland, an assistant principal at Portage High School, stated that in such a case, he would have to look at the whole situation because there is not a hard and fast discipline rule regarding that sort of behavior. He testified that he believed that such an occurrence may not be sexually harassing to the female student unless it was repeatedly done to her. Mr. Winland further testified that, in the hypothetical situation in which an investigation is undertaken and it is substantiated that the male student grabbed the female student's breast without permission, he would not make the disciplinary decision on his own; rather, he would involve the administrative team.

Mr. Winland testified that the police "possibly" would be called if the incident involved something "illegal," such as drugs. Mr. Munden testified that, in 2008-2009, there were ranges of consequences for specific disciplinary incidents but there were not definite consequences. Mr. Munden testified that, if a teacher or administrator became aware of a crime, there were no specific guidelines that advised which crime should be reported to the police. He also testified that, if the same male student were involved in a second allegation of sexual harassment, there were no guidelines regarding how repeat offenders should be dealt with nor were there guidelines regarding sexual harassment in general.

There were at least three avenues or sources from which a report of harassment on a school bus could have been made, namely the bus driver, the student who is the victim of the conduct, or a student who observed the bullying or harassment.

Assistant principal Halaschak testified that in 2008-2009, there were no guidelines in place to determine the circumstances or severity of bullying or sexual harassment and that it was left to each administrator's own personal judgment. Mr. Munden testified that, prior to the February 5, 2009 incident, he had not been involved in any seminars, classes, or instructional sessions regarding bullying or sexual harassment and that he was not aware of any such seminars for teachers during that time.

Mr. Halaschak testified that he was not sure what would be considered as sexually harassing behavior.  He testified that, although it was probably inappropriate behavior, he would not consider any of the following as being sexually harassing behavior if it was not directed at someone in particular or if it was unknown why the student was making the gesture: (1) a male student doing a crab walk and thrusting himself up and down in a sexual manner; (2) a male student yelling "fuck" in the classroom; (3) a male student yelling "I like girls' titties"; (4) a male student flicking his tongue through his fingers; (5) a male student showing a picture of his naked body from the waist up and saying "isn't that sexy" when horsing around with his friends; (6) a male student calling a female student and a female teacher "stupid bitches;" and (7) a male student repeatedly using the word "bitch" or "fuck."  (Pl. Br., Exh. 1, p. 20, ll. 13-25; p. 21, ll. 1-8; p. 57, ll. 11-25; p. 58, ll. 1-14; p. 67, ll.13-24; p. 68, ll. 20-25; p. 69, ll. 1-19).

Mr. Winland testified that, if a female student is subjected to sexual harassment, it "absolutely negatively impacts the student."  (Pl. Br., Exh. 17, p. 9, ll. 22-25).  Mr. Halaschak testified that he spends ninety percent of his time dealing with ten percent of the students.  He recognized that ninety percent of the students were affected by the other ten percent who caused discipline issues.  He hoped to solve the problem with the difficult students by going through progressive discipline.  Mr. Munden testified, "We have to look at it in terms of, you know, trying to work with kids and get them through, you know. So I mean we don't really look at it in terms of what's fair to the other kids."  (Pl. Br., Exh. 15, p. 38, ll. 4-7).

Defendant has a Bus Rules & Consequences handout, which students and their parents must sign, that provides that students must "obey the driver at all times" and further provides that "the school bus is an extension of your school, therefore all school rules and code of conduct apply while riding the bus."  (Def. Br., Exh. 13).  The Bus Rules & Consequences include a progressive model of discipline to address student misbehavior.  The "Consequences" are set out in an enumerated list and provide for discipline in the following order:  1. driver warning; 2. driver warning and seat

change; 3. referred to building principal; 4. 1 to 3 day removal; 5. 5 to 10 day removal; 6. removal for remainder of semester; 7. removal for rest of school year. *Id*. The section then provides that "[s]ome offenses will result in immediate removal from the bus," including but not limited to fighting, threatening violence, throwing objects, damaging the bus, or disrespecting the bus driver. Some bus drivers would turn the bus around and take the students back to either the school or residence if the student was very disruptive; the drivers had the discretion to stop the bus and call the police.

Bus drivers are instructed during the orientation process and through Portage Township Schools Transportation Department Procedures that school administrators are ultimately responsible for enforcing school and bus rules and administering punishment. If a bus driver believes referral to a building administrator is necessary for student discipline, the driver is instructed to submit a discipline report documenting the student misbehavior directly to the building administrator, who then determines the appropriate discipline. Principal Caren Swickard testified that if discipline problems are reported by the bus driver, then her administrative team is responsible. There were five to six assistant principals at the time.[2]

Out of a student population of about 2,700 of which approximately 2,000 students rode the bus, only 10 to 20 bus discipline referral forms a year were received by the administration from bus drivers regarding high school bus routes. Assistant principal Halaschak explained that, when he worked at the middle school, "we got a lot of them. Middle schools are a different animal[] from the high school. A lot of kids on the high school bus, most of them sleep on the bus, listen to music, whatever. We don't get a lot. When we do, we deal with it." (Pl. Br., Exh. 1, p. 17, ll. 21-25; p.

---

[2] On page 8 of the Statement of Genuine Disputes, Plaintiff cites page 14, lines 1-4 of Mr. Munden's deposition for the statement that the five to six assistant principals "received no training on how discipline on the buses was to be handled." (Pl. Stmt. Genuine Disputes, p. 8). Because page 13 of Mr. Munden's deposition is not included, it is not clear what the beginning of the question that finishes in lines 1-3 on page 14 provided: ". . . to Portage, had there been any meetings or training sessions or discussions about how discipline on the buses was to be handled?" (Pl. Br., Exh. 15, p. 14, ll. 1-3). Mr. Munden's response to the question is "no." *Id*. (l. 4).

18, l. 1).  From August 2008 through February 2009, Defendant had only received one discipline form from Mr. Burch.  Prior to the February 5, 2009 incident, Defendant had received no complaints about the other incidents on the bus detailed above other than Plaintiff's complaint regarding C.M.'s threat to kill her.

Ms. Coker testified that, when she trained Mr. Burch, she talked to him "about the kids and their mouths.  He was a religious man, and we talked about, you know, choosing your battles with these kids.  The most important thing was to get them to school safely; and if he had any issues or problems, to please come and talk to me and I would help him."  (Pl. Br., Exh. 3, p. 22, ll. 20-25 - p. 23, l. 1).  When asked what she meant by "choosing your battles," she explained, "Well, the language structure today is a whole lot different than when I was a child.  I mean kids use bad language, and it depends on where they come from, you know.  Whether you're going to scream, yell, write them up for using words that they shouldn't use, you know.  And that's what I meant about choosing your battle.  If a child threw something on the floor, I would pick it up instead of writing him up.  You know, the principals have a lot of responsibilities in school, and I think the drivers need to choose what they're going to write them up for."  (Pl. Br., Exh. 3, p. 23, ll. 2-13).

The Transportation Department Procedures, Section 4002, ¶ 2 provides:

> Each school administrator has a particular process through which discipline is administered.  It is essential that bus discipline be a part of that process.  The bus driver will work with the building principal of each school to ensure that discipline referrals are processed in accordance with their procedures.

(Def. Br., Exh. 15).  Section 4002 of the Transportation Department Procedures further provides in paragraph 3: "Drivers are encouraged to discuss student's misbehavior with the student's parents, either in person or by phone."  *Id*.

One bus driver testified that the bus drivers felt and still feel that their write-ups were ignored.  Ms. Coker acknowledges that this was true around the time Mr. Burch was terminated.  The same bus driver testified that, prior to February 5, 2009, the bus drivers felt that disciplinary

problems on the buses were not being addressed by the administration and even had a fear of being fired if they were frank and open about the discipline issues on the buses. After the incident, bus drivers were told to stop gossiping about what had happened or they would be fired. After the February 5, 2009 incident, the administration addressed bus discipline issues quickly.

Jennifer Salinas, who drove bus number 82 prior to Mr. Burch, experienced student threats to find her address, go to her home, rape her, kill her family in front of her, and then kill her. Ms. Salinas reported these threats to the administration at the time, although she did not know the boys' names; she testified that nothing was ever done other than the assistant supervisor of transportation telling her that the students were just bluffing. This occurred several years before the February 5, 2009 incident and did not involve the same boys. Ms. Coker testified that the other bus drivers felt that Mr. Burch was unjustly terminated because bus number 82 was a difficult route in terms of bus discipline issues.

Prior to the February 5, 2009 incident, complaints had been made regarding Mr. Burch's bus. Someone had complained to Ms. Coker, the assistant supervisor of transportation, that there had been smoking on Mr. Burch's bus. On another occasion, a person driving past the bus called the manager of the apartment complex where the bus had stopped who in turn called the school to report that a student on Mr. Burch's bus was using a body spray as a torch with a lighter to light paper on fire on the bus and was throwing it out of the bus window. Several students also complained about the incident in which C.M. had taken down his pants and stuck his bottom out the window. Ms. Coker spoke to Mr. Burch about the first two incidents. She testified that Mr. Burch indicated that he had not been aware of the incidents at the time. Officer Williams testified that Mr. Burch's response to whether he saw what was going on was that he did not see or know anything.

The recommendation by Mr. Harman, the supervisor of transportation, to suspend Mr. Burch was based solely on the February 5, 2009 incident and was not based on the other incidents; Mr. Harman has not investigated those other incidents.

## ANALYSIS

Defendant seeks summary judgment on all of Plaintiff's claims. The Court considers each in turn.

### A. Title IX

Count IV of Plaintiff's Amended Complaint alleges that Defendant is liable under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., which provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). "[A] school district receiving federal funding may be liable for damages under Title IX when one student sexually harasses another." *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 821 (7th Cir. 2003) (citing *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 633 (1999)). A school is liable for peer-to-peer sexual harassment under Title IX when a school is "deliberately indifferent to sexual harassment, of which [it] has actual knowledge, that is so severe, pervasive, and objectionably offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* (citing *Davis*, 526 U.S. at 650).

"Actual-not constructive-notice is the appropriate standard in peer-harassment cases. Courts, therefore, have focused on reports or observations in the record of inappropriate behavior to determine when school officials had actual notice." *Gabrielle M.*, 315 F.3d at 823 (citation omitted). Assuming, as does Defendant, that for purposes of this motion the conduct at issue was sufficiently severe, pervasive, and objectively offensive to support a Title IX claim, the Court finds that, once Defendant had actual notice, it was not deliberately indifferent to the sexual harassment and, thus, cannot be liable for any "concrete, negative effect" on Plaintiff's education.

Although Plaintiff does not allege any "concrete, negative effect" on her education prior to the February 5, 2009, incident, the Court nevertheless considers whether Defendant had actual notice

of the incidents of sexual harassment prior to that date as the cumulative effect of the harassment culminating in the more severe February 5, 2009 incident may have caused the alleged concrete, negative effect on her education after that date.

In her Statement of Genuine Issues, Plaintiff presents two instances of sexual harassment, only the second of which is asserted by Plaintiff in her response brief as a basis for the Title IX violation.  First, A.T. made various sexual comments to her, such as telling her that she had nice "titties" while he grabbed and squeezed her breasts on numerous occasions while on the bus when he sat with her; she also testified that "[t]hey'd . . . grab my genital area."  (Def. Br., Exh. 3, p. 168, l. 4).  Plaintiff testified that she witnessed the boys touching other female students in the same way they had been repeatedly touching her.  However, Plaintiff did not tell Mr. Burch, school administrators, teachers, or her parents about this touching; she only told her best friend.  There is no evidence that her best friend or any other students reported the touching and comments.  Thus, Defendant did not have actual knowledge of this harassment by A.T.  The second incident of sexual harassment is the February 5, 2009 incident of J.C. pushing another female student's head down toward C.M.'s exposed genitals after C.M. had sat down next to the female student on the bus against her wishes and then pulled down his pants, exposing his genitals.  Plaintiff testified that she saw the female student's head going down.  This harassment was reported to school officials that same day with notification to the principal of an incident on the bus.

"Once school officials have actual notice of sexual harassment, *Davis* imposes a duty to act.  But as long as the school's response is not 'clearly unreasonable,' it cannot have acted with the requisite deliberate indifference to incur Title IX liability."  *Gabrielle M.*, 315 F.3d at 824 (quoting *Davis*, 526 U.S. at 648-49).  To show deliberate indifference, a plaintiff must demonstrate an official decision by the school not to remedy the violation.  *See McGinnis v. Muncie Cmty. Sch. Corp.*, No. 1:11-CV-1125, 2013 WL 2456067, at *13 (S.D. Ind. June 5, 2013) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).  A court "should refrain from second-guessing the

22

disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. In an appropriate case, the inquiry as to whether a given response is not "clearly unreasonable" may properly be made by the court as a matter of law. *Gabrielle M.*, 315 F.3d at 817.

The implied damages remedy under Title IX is "predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation." *Gebser*, 524 U.S. at 290. An "appropriate person" for purposes of § 1682 is, "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Id*. Plaintiff asserts that Mr. Burch is an "appropriate person" who could take corrective action because he could impose discipline under the first three steps of the progressive model of discipline to address student misbehavior in the "Consequences" set forth in the Bus Rules & Consequences, namely first a driver warning, then a driver warning and seat change, and finally a referral to the building principal. It is unnecessary for the Court to decide whether Mr. Burch was an "appropriate person" under *Gebser* because there is no evidence that Mr. Burch had actual knowledge of sexual harassment on the bus.[3] Mr. Burch's undisputed testimony is that he did not witness the incidents of sexual harassment.

Plaintiff contends that a jury could "infer" or "conclude" that Mr. Burch had actual knowledge of sexual harassment and/or discrimination taking place prior to the February 5, 2009 incident because he had been trained to use the large inside mirror to continually scan and monitor the activity taking place in his bus. Pl. Br., pp. 11-12. Plaintiff also cites the note in each of the three male students' disciplinary files for the February 5, 2009 incident indicating that the students had previously threatened Mr. Burch and Plaintiff. However, inference or constructive knowledge

---

[3] *See C.S. v. Couch*, 843 F. Supp. 2d 894, 913 (N.D. Ind. 2011) (finding, in a Title VI case, that teachers "may well possess the requisite control necessary to take corrective action to end the discrimination," recognizing that "a school official who has the authority to halt known abuse, perhaps by measures such as transferring the harassing student to a different class, suspending him, curtailing his privileges, or providing additional supervision, would meet this definition") (quoting *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir. 1999)); *Staehling v. Metro. Gov't of Nashville and Davidson Cnty.*, No. 3:07-CV-0797, 2008 WL 42709379, at *10 (M.D. Tenn. Sept. 12, 2008) (finding that a school bus driver is not an "appropriate person" with authority for purposes of Title IX liability) (citing *Peer v. Porterfield*, No. 1:05-CV-769, 2006 WL 3898263, at *9 (W.D. Mich. Jan. 8, 2007) (collecting cases); *Nelson v. Lancaster Indep. Sch. Dist. No. 356*, No. Civ 00-2079, 2002 WL 246755, at *4 (D. Minn. Feb. 15, 2002)).

is insufficient. *See Gebser*, 524 U.S. at 283-84, 285 (rejecting petitioners' attempt to recover damages based on theories of respondeat superior and constructive notice for a teacher's sexual harassment of a student); *see also Gabrielle M.*, 315 F.3d at 823 (rejecting a claim of liability on the part of the school because actual, and not constructive knowledge, is the appropriate standard and the assertion of notice was based only on the fact that the teachers constantly supervise kindergartners and because the boy had been bothering the girl from the first day of school).

The Court finds as a matter of law that, once Defendant had actual notice of the February 5, 2009 sexual harassment on the bus, which was when the principal was advised of the incident that same day, Defendant's response was not "clearly unreasonable." Plaintiff does not argue otherwise. Defendant immediately suspended all three students the following day, after having escorted them off the bus that morning and into the school with the assistance of Officer Williams. Upon a full investigation of the February 5, 2009 incident, Defendant expelled the three students for the remainder of the semester and the following semester. *See Gebser*, 524 U.S. at 291 (finding in that case that the actual notice standard could not be met but nevertheless noting that the offending teacher's employment was terminated once the school learned that he had a sexual relationship with the student).[4] Thus, because Defendant did not act with deliberate indifference to the complaints once it had actual knowledge of the sexual harassment, summary judgment is appropriate on Plaintiff's Title IX claim.

Finally, the Court recognizes that a claim under Title IX is actionable only when the "behavior at issue denies a victim equal access to education." *Id.* (citing *Davis*, 526 U.S. at 651). "The harassment must have a 'concrete, negative effect' on the victim's education." *Id.* (citing *Davis*, 526 U.S. at 654); *see also Gabrielle M.*, 315 F.3d at 823 (listing examples of a negative impact on access to education such as dropping grades, becoming homebound or hospitalized due

---

[4] As to other reported incidents of disciplinary problems that were not sexual in nature, the evidence of record shows that Defendant took corrective action. For example, when Plaintiff filled out the form to complain that C.M. had threatened to kill her, C.M. received a detention.

to harassment, or physical violence, such as suicidal thoughts or attempts, and finding no evidence that the plaintiff was denied access to an education when her grades remained steady and her absenteeism from school did not increase notwithstanding a diagnosis of some psychological problems). In this case, Plaintiff has failed to demonstrate a genuine issue of material fact that she suffered a concrete, negative effect on her education as a result of the sexual harassment that occurred on February 5, 2009. Plaintiff testified that her grades had steadily remained Cs and Ds throughout her school career, including after the alleged harassment. Plaintiff missed "a lot" of school after the February 5, 2009 incident due to illness; however, she specifically testified that she did not miss school because of what happened on the bus. She graduated from Portage High School in 2011. Although Plaintiff testified that she became unsocial and did not attend social gatherings, she does not offer evidence that this affected her educational opportunities. Similarly, the evidence offered by Plaintiff in support of her mood swings does not address the time period following the February 5, 2009 incident through her graduation; again, however, even if she experienced these psychological effects, she has not shown that they deprived her of educational opportunities.[5] Regardless, even if Plaintiff could create a genuine issue of material fact that she suffered a concrete, negative effect on her education as a result of the sexual harassment on the bus, she still could not recover damages against Defendant under Title IX because Defendant was not deliberately indifferent to the harassment once it had actual knowledge of it.

### B. 42 U.S.C. § 1983

Count V of Plaintiff's Amended Complaint brings a claim of gender discrimination and sexual harassment in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983. Plaintiff alleges that, as a public

---

[5] Plaintiff testified that she saw a psychiatrist from June through August 2011 following the death of her boyfriend because her mood swings and anger had gotten worse than before the death of her boyfriend. She graduated in 2011. She has not offered evidence that the mood swings and anger she experienced before the death of her boyfriend were a result of the sexual harassment on February 5, 2009.

school, Defendant acted under the color of state law in depriving Plaintiff of her right to equal access to educational opportunities. She alleges that the three boys were sexually harassing and abusing Plaintiff because of her female gender, that Defendant knew the harassment was ongoing, that Defendant intentionally failed to act in response to the harassment and/or responded with deliberate indifference, and that Defendant's failure to prevent, stop, or remedy the harassment amounted to gender-based discrimination against Plaintiff, depriving her of her equal access to education because of her gender and causing her other damages and losses. In her response to summary judgment, Plaintiff now argues that Mr. Burch's "tort" becomes Defendant's liability because Defendant did not provide its employees with adequate training regarding sexual harassment and bullying.[6]

Section 1983 provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del. Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 749 n. 9 (1999) (quotation omitted); *see also Williams v. Wendler*, 530 F.3d 584, 586 (7th Cir. 2008). A cause of action may be brought under § 1983 against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, to state a claim under § 1983, a plaintiff must show (1) that she "was deprived of a right secured by the Constitution or federal law" (2) "by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006).

---

[6] In her response brief, Plaintiff preemptively argues that Defendant may assert in its reply brief that Plaintiff cannot now argue failure to train as the basis of her § 1983 claim because she does not specifically allege failure to train in her Amended Complaint and contends that, under Indiana's notice pleading rules, a plaintiff need only plead the operative facts involved in the litigation. Pl. Resp., p.15 (citing *State v. Rankin*, 294 N.E.2d 6904, 606 (1973)). In the reply brief, Defendant notes only that Plaintiff incorrectly cites to state procedural law rather than the applicable federal pleading standards. However, Defendant cites no law and does not argue that Plaintiff cannot assert failure to train as the basis for *Monell* liability on her § 1983 equal protection claim.

Plaintiff alleges a violation of the Equal Protection Clause of the Fourteenth Amendment, the purpose of which is to prohibit intentional and arbitrary discrimination. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). This includes prohibiting school officials from either intentionally or with deliberate indifference denying students, on the basis of sex, protection from sexual harassment. *Nabozny v. Podlesny*, 92 F.3d 446, 454-55 (7th Cir. 1996).

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government is responsible under § 1983." *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). Therefore, Defendant, as a school corporation, can only be held liable for a constitutional violation under § 1983 if Plaintiff can demonstrate:

> (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012) (quoting *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007) (quoting *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007)); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257-58 (2009) (holding in a case of student-to-student sexual harassment "that § 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools") (citing *Monell*, 436 U.S. at 694).

A plaintiff must demonstrate a causal connection between the policy or practice and her injury. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, (7th Cir. 2012) ("The plaintiff must show . . . that the policy or custom was the 'moving force [behind] the constitutional violation.'" (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694)). A municipality may be liable based on a failure to provide adequate training to its employees; however, "as with any other policy or practice for which the plaintiff seeks to hold the municipal

. . . . defendant liable, the plaintiff must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference to the rights of the individuals with whom those employees will interact." *Id*. (citing *Harris*, 489 U.S. at 389).

In the Motion for Summary Judgment, Defendant argues that there is no evidence of intentional discrimination and that all of the evidence of record demonstrates that Defendant responded immediately and reasonably once it had notice of the sexual harassment on bus number 82. Defendant further notes that it had various policies in place to prevent harassment and that Plaintiff did not report the sexually harassing conduct of A.T. to school administrators, teachers, or her parents. Finally, Defendant asserts that there is no evidence that anyone with final policymaking authority contributed to or caused Plaintiff's alleged deprivation.

In her response brief, Plaintiff contends that Defendant did not adequately train its principals, transportation supervisor, assistant transportation supervisor, bus driver trainer, bus drivers, and Mr. Burch regarding sexual harassment and bullying. Plaintiff argues that there is a genuine issue of material fact as to whether the training was adequate and, therefore, whether it represented a "municipal policy and/or custom" of deliberate indifference that was likely to result in a violation of Plaintiff's constitutional rights as both a female and a student. Plaintiff asserts that Defendant's various written policies to prevent harassment does not obviate the requirement that Defendant adequately train its employees in that regard, as its employees were to be the enforcers of those policies. To the point, Plaintiff argues that Mr. Burch was the employee responsible for the enforcement of the policies on the bus, yet he did nothing to enforce the harassment policies despite having the authority to do so as a result of Defendant's custom of inadequate training.

However, Plaintiff has failed to argue how any training or lack thereof caused a constitutional violation in her case. She has not raised any genuine issue of material fact that Mr.

Burch failed to enforce the school's policies against sexual harassment such that he violated her constitutional right to equal access to educational opportunities under the law.

When Plaintiff reported to Mr. Burch that C.M. had threatened to kill her, Mr. Burch facilitated Plaintiff's filling out of a complaint form that led to C.M. being disciplined; Plaintiff testified that C.M. did not bother her after that. As previously noted, Plaintiff did not report the comments and touching by A.T., and she has offered no evidence of how Mr. Burch's training could have prevented or responded to harassment of which he was not aware.

As for the February 5, 2009 incident, the evidence of record again is that Mr. Burch was not aware of the incident. As soon as Defendant became aware of the incident, Defendant enforced its harassment policies, immediately suspending and eventually expelling the students. To the extent Plaintiff argues that Mr. Burch's training was inadequate to detect the sexual harassment while he was driving the bus, she contradicts herself by identifying evidence that he was properly trained to scan his mirrors routinely, including the inside mirror to observe activities on the bus. Despite this training by Defendant, Mr. Burch did not see the February 5, 2009 incident. Plaintiff does not identify any harassment policies that were not enforced by Mr. Burch or what training was inadequate in relation to the events on February 5, 2009. Moreover, Plaintiff does not point to any evidence that demonstrates that Defendant did not discipline a student in response to known acts of sexual harassment or inappropriate conduct.[7] Finally, to the extent Plaintiff may be attempting to assert in her response brief that § 1983 supports recovery for a state law tort of negligence by Mr. Burch, she is incorrect; § 1983 only allows for recovery of federal constitutional torts and not state law torts. *See Newsome v. McCabe*, 256 F.3d 747, 749-50 (7th Cir. 2001); *see also Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) ("Section 1983 was intended to protect only federal rights

---

[7] To the extent Plaintiff notes in her Statement of Genuine Disputes that some school administrators may classify certain conduct as "inappropriate" rather than "sexual harassment" or "bullying" it is a distinction without a difference given that she has not identified any such behavior, however classified, of which Defendant was aware yet failed to address.

guaranteed by federal law, and not tort claims for which there are adequate remedies under state law."). Accordingly, summary judgment is granted in favor of Defendant on Plaintiff's § 1983 equal protection claim.

## C. State Law Claims

The Court has granted summary judgment in favor of Defendant on Plaintiff's federal claims, which were the sole basis for removal of this action under 28 U.S.C. § 1331 by Defendant. The parties are not diverse. The Court's jurisdiction over the Plaintiff's remaining state law claims sounding in negligence is based on 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over claims based on state law that are closely related to the federal claims in a case. When a district court has only supplemental jurisdiction over remaining state claims, it may decline to exercise its jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see Whitely v. Moravec*, 635 F.3d 308, 311 (7th Cir. 2011) (recognizing that § 1367(c)(3) gives the court discretion to relinquish supplemental jurisdiction and remand once the federal claim has been resolved).

"[T]he presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims" when the federal claims are dismissed before trial. *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) (citing 28 U.S.C. § 1367(c)(3)). A district court should exercise its discretion to relinquish jurisdiction over supplemental state law claims remaining after the dismissal of federal claims subject to three exceptions: "when the [refiling] of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008). None of the exceptions are applicable in the instant case. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state law claims and, as a result, declines to rule on Defendant's Motion for Summary

Judgment on the state law claims.  The state law claims are remanded for consideration by the state court.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** Defendant's Motion to Strike Portions of Plaintiff's Statement of Genuine Disputes [DE 44], **GRANTS** the Motion for Summary Judgment [DE 29] as to the federal Title IX and § 1983 claims, and **REMANDS** the Indiana state law claims in Counts I, II, and III.  The Court **DIRECTS** the Clerk of Court to Enter Judgment in favor of Defendant on Counts IV and V of the Amended Complaint.    So ORDERED this 9th day of August, 2013.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record